**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| BONNIE ZEPHRINE, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. AW-02-1796 |
| PRINCE GEORGE'S COUNTY, | * | |
| MARYLAND, *et al.*, | | |
| Defendants. | * | |

\* \* \* \* \*

**MEMORANDUM OPINION**

This suit arises out of the death of Charles Huddleston, Jr. ("Huddleston" or the "Decedent").

Plaintiffs Bonnie Zephrine and Charles Ivy Huddleston, Sr.[1] ("Plaintiffs"), as the natural parents and

personal representatives of the Decedent's Estate, have brought this suit against Prince George's

County, Maryland ("PGCM") and PGCM police officer David McDonald ("McDonald"), PGCM

police officer David Levin ("Levin"), and PGCM police officer Crandell Weaver ("Weaver"), the

Town of Morningside ("Morningside"), and Joel Brickell ("Brickell"), a Morningside police officer.

On April 24, 2002, Plaintiffs filed a complaint against the listed defendants, alleging various

violations of state and federal law, including claims for wrongful death, excessive force, *Monell*

violations, and various state tort actions. Currently pending before the Court is Defendants

Morningside and Brickell's Motion for Summary Judgment [216] and Defendants PGCM, Weaver,

McDonald and Levin's Motion for Summary Judgment [217]. The Court has reviewed the entire

record, as well as the pleadings with respect to the instant motions. No hearing is deemed necessary.

*See* Local Rule 105.6 (D. Md. 2004). For the reasons set forth in more detail below, the Court will

---

[1] Plaintiffs have stated that the Decedent may have one son, Alexander Anderson. If a paternity test indicates that the Decedent fathered Alexander Anderson, Plaintiffs state that Alexander Anderson will also be a plaintiff in this suit.

grant in part and deny in part both motions for summary judgment.

## FACTUAL & PROCEDURAL BACKGROUND

This Court has recited many of the facts of this case in earlier opinions.  For the purposes of resolving the instant motions, the following facts are viewed in the light most favorable to Plaintiffs. On April 26, 1999, a carjacking and shooting occurred at an Amoco gas station, located at 3600 Saint Barnabas Road in Temple Hills, Maryland.  The carjacker fled in the victim's green Jeep Cherokee.  The PGCM dispatcher sent out a call for officers to respond and told officers to look for the carjacker in the victim's vehicle.

At approximately 9:00 p.m., Officer Brickell observed Huddleston in a green Jeep Cherokee in a parking lot across from Andrew's Air Force Base.  Brickell followed Huddleston as he exited the parking lot.

Officer Weaver, who was not on duty on the night of April 26, also heard the radio call about the carjacking and shooting.  At the time, Weaver was working as a security guard for Andrews Manor Apartment Complex.  Weaver observed a green Jeep Cherokee enter the apartment complex. Suspecting that this Jeep was the victim's vehicle, Weaver began to follow the vehicle and radioed the dispatcher that he had spotted the Jeep.  Both Brickell and Weaver ultimately apprehended Huddleston in the green Jeep at or near the Andrews Manor Theater in Prince George's County, Maryland.

Parties hotly dispute the events that occurred during the arrest.  According to one of Plaintiffs' witnesses, when the vehicle came to a stop, Officers Weaver and Brickell "yanked" Huddleston from the car.  At this point, Officer Levin had joined Brickell and Weaver at the scene.

2

Plaintiffs have two witnesses who observed parts of the arrest from a nearby parking lot, Joseph Russell Gear ("Gear") and his stepfather, Alvin Wayne Hardesty ("Hardesty").  Gear has testified that once Huddleston was removed from the vehicle, one officer smashed Huddleston's head down on the asphalt two or three times.  Then, Gear saw several officers kicking Huddleston "like a soccer ball" even though Huddleston's hands were behind his back for at least a minute.  Gear Depo. at 27, 72.  Gear also has stated that he believed that a Morningside officer was holding Huddleston's ankles while two other PGCM officers kicked Huddleston.[2]  Gear Depo. at 70-71. Hardesty offered a similar account and has stated that he saw "a lot of feet" and that he saw officers "kicking the hell out of " Huddleston.  Hardesty Depo. at 16.  Although Hardesty did not know if the Morningside officer "was stomping" Huddleston, he confirmed that he saw that the Morningside officer "had his hand" on Huddleston and was attempting to keep Huddleston down.  Hardesty Depo. at 87-88.

The officers at the scene, however, paint a much different picture.  They have testified that Huddleston exited the green Jeep without assistance and that, in the midst of fleeing, Huddleston tripped on the median strip and fell to the ground.  Initially, it appeared that Huddleston would cooperate and knelt on the ground with his hands up in the air.  Brickell placed handcuffs on one of Huddleston's arms, at which point, the officers claim that Huddleston began struggling with the officers for over a minute.  During this period, according to the officers' rendition of the facts, Huddleston attempted to rise from his knees and kicked Weaver during the struggle.  To control Huddleston, Brickell has stated that he sprayed pepper spray into Huddleston's face.  In addition,

---

[2]  Both Gear and Hardesty have testified that they could identify one of the officers as a Morningside officer because he had a different uniform than the rest of the officers.

Levin has testified that Huddleston reached toward Levin's waistband area and that, as a result, Levin punched Huddleston in the face to stun him.   The officers eventually restrained Huddleston and placed handcuffs on both arms.  After restraining Huddleston, Brickell retrieved some water and washed the pepper spray from Huddleston's face.  All officers deny punching or kicking Huddleston *while* he was restrained.   Instead, they contend that Huddleston sustained injuries because Huddleston was resisting arrest and that they had to use some force to handcuff him and that even after the arrest, Huddleston screamed incoherently.

All parties agree that someone summoned an ambulance to take Huddleston to the hospital because of his injuries,[3] though it remains unclear who called the ambulance and when this call was made.  In any event, the record reflects that emergency medical personnel came to the scene of the arrest and loaded Huddleston into an ambulance.  Police officers accompanied Huddleston in the ambulance, including Sergeant Kenneth Huff ("Huff").   In his deposition, Huff has stated that Huddleston began to yell, curse, spit, and move about while being transported to the hospital.  To avoid contact with Huddleston's saliva, EMS personnel placed a sheet over his face. The ambulance carrying Huddleston arrived at Southern Maryland Hospital at approximately 10:25 p.m.  While at the hospital, Huddleston remained in police custody and was restrained by "tuff-cuffs" around his wrists and ankles.  Huddleston seemed alert at this time and continued to yell.  At some point, hospital personnel administered the drug Haldol to Huddleston and shortly after Huddleston became quiet.  A few minutes later, one of the nurses indicated the Huddleston's pulse had become weak.  Hospital personnel began CPR, but could not revive Huddleston.  Huddleston was pronounced dead

---

[3]  Huddleston's autopsy indicated that he sustained injuries to his face, including a contused abrasion on his nose, swelling of his eye socket, abrasions on his chin, neck and cheek as well as bleeding and swelling of other parts of his body.

at 11:18 p.m.

It has come to light that Huddleston appeared to have a congenital medical condition, for which he received periodic treatments at Southern Maryland Hospital. Huddleston's autopsy also confirmed that Huddleston had an anomalous right coronary artery. Plaintiffs' medical expert has acknowledged that in rare cases, an anomalous coronary artery may cause death, but has opined that the administration of Haldol, at least in part, led to Huddleston's death.

Plaintiffs filed this suit on April 24, 2002. Plaintiffs' Fourth Amended Complaint alleges federal claims under 42 U.S.C. § 1983 and alleges state claims under the Maryland Wrongful Death Statute, Md. Code Ann., Cts. & Jud. Proc. §§ 3-901 to 3-904 (2005), the Maryland Survival Act, Md. Code Ann., Cts. & Jud. Proc. § 6-401 and Md. Code Ann., Est. & Trusts § 7-401(x), and the Maryland Constitution.[4] On November 15, 2005, this Court issued an Order bifurcating and staying all of Plaintiffs' 1983 *Monell* claims against PGCM.

On March 28, 2006, Defendants Morningside and Brickell filed a motion for summary judgment. Just two days later, Defendants PGCM, Weaver, McDonald and Levin (collectively, "PGCM Defendants") filed their own motion for summary judgment. These motions are ripe and ready for disposition, and the Court now will issue an Opinion.

## STANDARD OF REVIEW

Summary judgment is only appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). In a motion for summary judgment, the moving party

---

[4] Plaintiffs' Fourth Amended Complaint also sets forth claims for medical malpractice. As Plaintiffs previously have dismissed all the medical defendants voluntarily, this Court will dismiss Count 8 and 9.

discharges its burden by showing an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal citations omitted). To defeat a motion for summary judgment, the non-moving party must come forward and show that a genuine issue of material fact exists. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

With regard to Plaintiffs' Section 1983 claims, all Defendants contend that they are entitled to summary judgment on qualified immunity grounds. The doctrine of qualified immunity seeks to strike a balance between competing social objectives, by allowing the "vigorous exercise of official authority" while at the same time recognizing a possibility of redress for victims of officials' abuses. *See Butz v. Economou*, 438 U.S. 478, 504-06 (1978). Therefore, as against claims under federal law, "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Jones v. Buchanan*, 325 F.3d 520, 531 (4th Cir. 2003) (declaring that "qualified immunity operates to ensure that before [governmental actors] are subject to suit, officers are on notice that their conduct is unlawful"). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," a trial judge must resolve the qualified immunity inquiry at the

earliest possible stage in litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Turmon v. Jordan*, 405 F.3d 202, 204 (4th Cir. 2005).

## DISCUSSION

I.   **Plaintiffs' 1983 Allegations**

Because qualified immunity completely shields an officer from a suit for a violation of the Decedent's federal constitutional rights, the viability of Plaintiffs' 1983 claims turn on the resolution of this issue.

The Supreme Court has clarified that in excessive force cases, as in all other cases, entitlement to qualified immunity is a two step inquiry, which must be "considered in proper sequence." *See Saucier v. Katz*, 533 U.S. 194, 200 (2001). Initially, a court must address the threshold question of whether a plaintiff has alleged facts setting forth valid claims for a deprivation of a constitutional right. *Id.* at 201; *see also Williams v. Hansen*, 326 F.3d 569, 574 (4th Cir. 2003). Then, if Plaintiffs' constitutional claims survive this threshold review, the court must determine whether that right was clearly established at the time of its alleged violation so that a reasonable person would have known of its violation. *Williams*, 326 F.3d at 574. In this second inquiry, the court must consider whether a reasonable officer could have believed that his conduct was unlawful. *See Wilson v. Lane*, 526 U.S. 603, 615 (1999). If so, qualified immunity protects the officer from personal liability.

1.   Qualified Immunity of Officer Brickell

Officer Brickell argues that he is entitled to summary judgment, contending that he acted properly while arresting Huddleston on April 26, 1999, and, thus, did not violate any of Huddleston's constitutional rights. Brickell also asks this Court to dismiss Plaintiffs' claims because

he claims that his actions did not proximately cause Huddleston's death.  Finally, Brickell maintains that even if this Court does find that he used more force than necessary to subdue Huddleston, it should grant his request for summary judgment nonetheless, asserting that it was not objectively apparent that his actions would violate Huddleston's constitutional rights.

A.

The Court first turns to the threshold question of whether, taken in the light most favorable to the party asserting the injury, the facts show that Brickell's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201.  Because there is a genuine issue as to whether Officer Brickell unreasonably used excessive force against the Decedent, the Court denies summary judgment as to Officer Brickell.

The right at issue here is the Decedent's Fourth Amendment right to be free from unreasonable seizures, a right which includes seizures accomplished by excessive force.[5]  *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).  To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a seizure occurred and that it was unreasonable.  *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989).  Brickell does not dispute that he and the other officers used some physical coercion to arrest Huddleston or that such force could constitute a seizure under certain circumstances, but this admission alone does not establish a violation of Huddleston's constitutional rights.  Rather, whether an officer violated the

---

[5]  Plaintiffs also allege a violation of the Fourteenth Amendment.  The Supreme Court has made clear that a constitutional violation related to the arrest or seizure of a person must be analyzed under the Fourth Amendment, not the Fourteenth Amendment.  *See, e.g.*, *Graham v. Conner*, 490 U.S. 386, 395 (1989) (holding that a Section 1983 claim for excessive force is an allegation of a Fourth Amendment violation not a Fourteenth Amendment violation).  Consequently, this Court will grant summary judgment on Counts 5, 13, and 16.

Fourth Amendment by using excessive force during a seizure depends on the context, and courts must analyze the officer's actions under a standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The constitutional characterization of force as excessive under the Fourth Amendment must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 399 (internal quotations marks omitted). This standard is fact specific, and a court should consider several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest." *Wilson v. Flynn*, 429 F.3d 465, 468 (4th Cir. 2005) (quoting *Graham*, 490 U.S. 396). Because police officers necessarily must make "split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving," a court must evaluate the facts from the perspective of a reasonable officer on the scene, and not in hindsight. *Graham*, 490 U.S. at 396-97. Consistent with this view, the Fourth Circuit has reiterated that "reasonableness is determined based on the information possessed by the officer at the moment that force is employed." *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005).

Even viewing the evidence in the light most favorable to Plaintiffs, Brickell reasonably could have believed that Huddleston had carjacked and shot the victim, potentially possessed a gun, and resisted arrest to some extent. Based on these facts, Plaintiffs concede that Brickell would have acted lawfully by holding Huddleston down to effectuate the arrest and by using pepper spray.

It, however, remains disputed whether Brickell only used force during Huddleston's arrest. Plaintiffs' witness Gear has stated during his deposition that a Morningside officer held Huddleston down while the other officers kicked Huddleston despite the fact that Huddleston appeared to be

restrained.  Because Brickell was the only Morningside police officer at the scene, Gear's testimony suggests that Brickell held Huddleston so that the other officers could beat him even though Huddleston no longer presented a threat to the officers.

As an initial matter, Defendants implicitly argue that Brickell could not have violated Huddleston's Fourth Amendment rights if Brickell did not hit or strike Huddleston.  This Court does not agree with this assumption.  What force may be excessive under the Fourth Amendment is a protean concept.  What constitutes excessive force in one context may be deemed minimal and constitutional in another.  *Compare Turmon*, 405 F.3d 202 (holding that pointing a gun at a suspect's face, jerking him from his room, and handcuffing him without reasonable suspicion violated the suspect's right to be free from excessive force) *with Wilson v. Flynn*, 429 F.3d 465 (4th Cir. 2005) (holding that police officer did not use excessive force in arresting suspect even though the suspect's face was badly bruised because suspect actively resisted arrest and suspect initially claimed that he sustained the bruises when he fell against a fireplace).  While "excessive force" is not clearly defined, this Court finds that this term may encompass the act of restraining an individual for the purposes of allowing others to inflict injury.  Therefore, the critical question in this case is not whether Brickell "hit or struck Huddleston," but whether he held Huddleston while Huddleston was fully restrained so that the other officers could hit or kick him.

Urging this Court to find that Brickell did not restrain Huddleston in this manner, Defendants rely on the following portions of Hardesty's deposition testimony.  When asked by Brickell's counsel, "Would it be fair to say that what you observed the Morningside officer doing is trying to control Mr. Huddleston to get him on the ground," Hardesty answered, "Yes.  With the Morningside one, yes."  Hardesty, however, also admitted that he could not see clearly what happened to

Huddleston because *Gear* had a better vantage point.  *See* Hardesty Depo. at 96.  Furthermore, Hardesty's response to counsel does not indicate what he would classify as "trying to control" Huddleston.  One interpretation of this testimony is that Brickell was trying to handcuff Huddleston and keep him on the ground.  But, another reading of this testimony is that Brickell was holding Huddleston on the ground even after Huddleston was handcuffed.  The second interpretation seems all the more plausible in light of Hardesty statements that the Morningside officer was "trying to manhandle" Huddleston and that Huddleston "wasn't fighting back."  Hardesty Depo. at 20 and 88.  Hardesty also testified that he specifically recalled the Morningside officer kick Huddleston. Hardesty Depo. at 94.  At best, Hardesty's deposition shows that witnesses have offered differing accounts of the same events. When performing a qualified immunity analysis, a court cannot decide the credibility of conflicting testimony on a motion for summary judgment.  *See Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998) (explaining that  "disputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context."); *Summerlin v. Edgar,* 809 F.2d 1034, 1039 (4th Cir. 1987) ("Credibility of conflicting testimony is not, on a summary judgment motion, an issue to be decided by the trial judge").  Because material facts remain in dispute as to whether Brickell employed excessive force in Huddleston's arrest, this Court rejects Brickell's argument that he is entitled to summary judgment on these grounds.

## B.

In his brief, Brickell also advances the position that he cannot be held liable because the EMS and medical personnel at Southern Maryland Hospital, not the police officers, directly caused Huddleston's death.

The Supreme Court has explained that Section 1983, generally, "should be read against the

background of tort liability." *See Monroe v. Pape*, 365 U.S. 167, 187 (1961) *rev'd in part on other grounds by Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).  As in an action sounding in tort, a plaintiff must show that the alleged actions resulted in the asserted injury. *See Price v. City of Charlotte*, 93 F.3d 1241, 1245 (4th Cir. 1996) ("[D]amages awarded pursuant to § 1983 often find their genesis in the common law of torts, and the gravamen of tort law is "*compensation for the injury caused to plaintiff by defendant's breach of duty.*") (quoting  *Carey v. Piphus*, 435 U.S. 247, 255 (1978)) (emphasis in original).  Accordingly, damages under Section 1983 are only available for violations of constitutional rights that have caused compensable injury.  *Carey*, 435 U.S. at 255 (1978).  Thus, establishing causation is essential for Plaintiffs to prevail in their 1983 claims.

When analyzing causation in 1983 suits, courts have looked to the common law requirement of proximate cause. *See, e.g.*, *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) (requiring that a finding of cause in fact and proximate cause must precede the imposition of supervisory liability under 1983 for constitutional violation committed by his subordinate).  As such, proximate cause is established if the injuries alleged are the "natural consequences" of Brickell's actions.  *Monroe*, 436 U.S. at 187.

While Plaintiffs initially theorized that Huddleston could have died from the injuries he sustained during the alleged beating alone, Plaintiffs' expert,  Dr. Michael  Baden ("Dr. Baden"), has opined that Haldol was the most important factor in causing Huddleston's death.[6]  Brickell and the other Defendants appear to hold the opinion that Dr. Baden's statement proves that their conduct could not be the proximate cause of Huddleston's death.  This view, however, is not supported by the relevant case law.

---

[6] Neither party offers an opinion as to whether the hospital's administration of Haldol was negligent.

Considering the facts in the light most favorable to Plaintiffs, there exists ample evidence that the beating Huddleston received on the night of April 26, 1999 was the cause in fact of his death.  Individuals' actions are the cause in fact of an injury if their conduct "is a substantial factor in bringing about the harm."  Restatement (Second) of Torts § 431 (1965); *see also* Prosser & Keeton § 41; *accord Yonce v. SmithKline Beecham Clinical Laboratories, Inc.*, 680 A.2d 569, 575-76 (Md. Ct. Spec. App. 1996).  The relevant considerations in determining whether a person's negligent conduct served as a substantial factor in bringing about the harm include:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]
> (c) lapse of time.

Restatement (Second) of Torts § 433.

Even when there is causation in fact, courts have been reticent to hold a defendant liable for conduct  if he could not have foreseen that his actions would result in the specific type of harm that occurred.  *See generally Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928) (discussing the concept of foreseeability); *see also Stone v. Chicago Title Ins. Co.,* 624 A.2d 496 (Md. 1993).  Although most of these cases primarily speak in terms of negligence, the same rules apply to intentional torts.  *See* Restatement (Second) of Torts §§ 870 comment 1, 431 comment d; *see also Hibma v. Odegaard*,769 F.2d 1147, 1155 (7th Cir. 1985) (noting that foreseeability is necessary to recover for injuries even if plaintiff alleges that the defendant committed an intentional tort).  In other words, "even where the harm would not have occurred but for the tortious act, there is no liability if, although the resulting harm was of the same general nature as that intended, the

defendant's act did not increase the risk of harm through the means by which it occurred." Restatement (Second) of Torts § 435A, comment a.  As a corollary,

> [a] person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, whether or not it is expectable, except where the harm results from an outside force the risk of which is not increased by the defendant's act.

Restatement (Second) of Torts § 435A.  In such cases, where a subsequent extraordinary force further injures the plaintiff, the latter force acts as a superceding cause, and the original tortfeasor may be relieved  from liability for the harm caused by the third person's acts.

In this case, Plaintiffs claim that, at the very least, Brickell held Huddleston so that other officers could beat him, in derogation of his rights under the Fourth Amendment.  Plaintiffs have presented evidence, in the form of the deposition testimony of both Gear and Hardesty, that indicates Brickell's actions contributed to the need for medical intervention, and because of this alleged assault, medical personnel were summoned to treat Huddleston's injuries. Hardesty stated directly that the only Morningside officer at the scene kicked Huddleston.  If Hardesty and Gear's deposition testimony accurately portrays the events of that night, this Court agrees with Plaintiffs that Huddleston's need for medical attention was neither extraordinary nor unexpected.  To the contrary, if Brickell kicked and unlawfully restrained Huddleston, the risk that Huddleston would be harmed by medical personnel was both foreseeable and a natural consequence of the assault.  At this stage, it remains very much in dispute whether Brickell played an active role in beating and/or kicking Huddleston while he was restrained, which militates against granting summary judgment.[7]

---

[7] Parties disagree as to the import of the causation issue.   Brickell seems to argue that this Court must grant summary judgment if his acts were not the proximate cause of Huddleston's *death*.  Plaintiffs have brought both survival and wrongful death claims against

Moreover, as reasonable minds could draw more than one inference from the available evidence, causation in this case is a question of fact for the jury. *See Weisman v. Connors,* 540 A.2d 783, 798 (Md. 1988).

C.

As previously noted, a finding that Brickell may have violated the Decedent's Fourth Amendment rights alone does not foreclose the qualified immunity defense. Qualified immunity applies in situations in which a police officer reasonably, but mistakenly, believes that he is acting lawfully. *See, e.g., Brown v. Gilmore,* 278 F.3d 362, 369 (4th Cir. 2002). As a result, liability will only attach if the officer violates a "clearly established" constitutional right. This rule reflects the broader principle that a police officer should not be subject to liability for damages unless he is on notice that his conduct is unlawful. *See Jones,* 325 F.3d at 531.

A constitutional right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 531. More than ten years before Huddleston's arrest, the Supreme Court articulated the objective reasonableness test for Fourth Amendment excessive force claims in *Graham v. O'Connor.* As of April 1999, both the Supreme Court and the Fourth Circuit had held repeatedly that "using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen" is not objectively reasonable. *Jones,* 325

---

Brickell under 1983. Neither party disputes that if Brickell used excessive force against Huddleston, had Huddleston lived, he would have had the right to bring a 1983 claim for injuries from the alleged beating. Plaintiffs' survival action is the 1983 action just described. While it appears uncertain which specific injuries were directly attributable to the alleged beating, rather than the hospital's negligence, it is apparent that in all circumstances Plaintiffs would still be able to maintain an action for the injuries caused by the beating alone. To grant summary judgment on the survival claim based on the fact that the hospital's negligence allegedly proximately caused Huddleston's death would lead to the perverse result of putting Defendants in a substantially better position simply because Huddleston died.

F.3d at 532.  Such force does not comport with the requirements of the Fourth Amendment, even when the individual is suspected of criminal activity and has resisted arrest.  *See, e.g.*, *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994);  *Kane v.  Hargis*, 987 F.2d 1005 (4th Cir. 1993); *see also Mayard v. Hopwood*, 105 F.3d 1226 (8th Cir. 1997) (holding that officer was not entitled to qualified immunity who slapped and punched a suspect, in handcuffs and leg restraints, even though, prior to being completely restrained, the suspect had kicked and hit an officer and physically resisted arrest).

As these earlier cases reflect, a reasonable officer would appreciate that the alleged conduct, holding a suspect in handcuffs while other officers beat and kicked him, violated the suspect's Fourth Amendment right to be free from unreasonable seizures.  Considering that certain facts and eyewitness testimony support Plaintiffs' theory that Brickell held Huddleston down after he was fully restrained to permit others to kick Huddleston, this Court cannot conclude that Officer Brickell is entitled to qualified immunity as a matter of law.

2.    Qualified Immunity of Officers McDonald, Levin and Weaver

The PGCM officers make two arguments in favor of their motion for summary judgment.  First, Defendants McDonald, Levin and Weaver contend that this Court should grant their motion because Gear and Hardesty's testimony does not describe the conduct of any specific officer.  Second, they claim that the force used on Huddleston was objectively reasonable under the circumstances.

McDonald, Levin, and Weaver have all testified in their deposition that they actively restrained Huddleston at the time of his apprehension.  Specifically, McDonald has stated that Officer Brickell had the first contact with Huddleston and that he was the second officer to have

contact with Huddleston.  McDonald admits to grabbing Huddleston's feet and hitting Huddleston

in the legs.[8]  Weaver has also stated that he tried to "maintain" Huddleston's legs.  Levin has

testified that he touched Huddleston and punched him in the face. In addition, Hardesty testified that

the Morningside officer, a black PGCM officer, and a white PGCM officer struck and beat

Huddleston while two PGCM officers looked on.   All the officers, however, deny beating

Huddleston after he was successfully handcuffed.

Plaintiffs' allegations against Weaver, McDonald and Levin conflict with Gear and

Hardesty's testimony in that both witnesses have said that three police officers, rather than four, beat

and kicked Huddleston.  Hardesty Depo. at 19-20, 47-38; Gear Depo. at 18-19.   Defendant Weaver

is a black male, and officers Levin and McDonald are white males.  As such, one could reasonably

infer that Gear and Hardesty believe that they observed Weaver beating Huddleston as well as either

Levin or McDonald.  This finding is buttressed by the fact that Weaver, McDonald and Levin also

admit to having physical contact with Huddleston and that Huddleston's autopsy revealed extensive

injuries to his face, back and arms.   It deserves emphasis that there is an question of fact as to

whether the type of conduct alleged, and that Gear and Hardesty have testified that they witnessed,

occurred.  At this point, however, there is evidence that McDonald, Weaver, and Levin participated

in the alleged beating.[9]  Therefore, drawing all reasonable inferences in Plaintiffs' favor, there is a

---

[8]  According to Officer Weaver, McDonald also held Huddleston's upper body at some point, and McDonald was attempting to get Huddleston's arms behind his back during the arrest. Weaver Depo. at 43-44, 47.

[9]  Plaintiffs insist that Gear and Hardesty will be able to identify the officers in Court at trial. This Court cautions Plaintiffs that if at any time it becomes clear that the potential witnesses cannot indicate specifically who was involved in the alleged beating, this inability will seriously undermine their cases against the PGCM officers.

genuine issue of fact as to whether these PGCM officers violated the Decedent's constitutional rights.

As discussed in detail above, kicking and beating a suspect while the suspect is restrained is not objectively reasonable.   Once Huddleston was handcuffed, the officers could not have reasonably perceived him as a further threat. This Court also finds that this conduct, if proved, violated Decedent's Fourth Amendment rights that were clearly established in 1999.   The dispute surrounding the key facts of this case invariably leads to the conclusion that summary judgment on Plaintiffs' 1983 claims against Officers Weaver, McDonald, and Levin is inappropriate at this time.

3.      *Monell* Violations

Because this Court has found that there exists an issue of fact as to whether Weaver, McDonald, and Levin violated the Decedent's constitutional rights, this Court finds that PGCM's request for summary judgment on Plaintiffs' *Monell* claims is premature.  This Court previously stayed all discovery related to PGCM for *Monell* violations, and as a result, Plaintiffs have not had an opportunity to collect evidence that would tend to show that a County policy or procedure authorized or led to the alleged constitutional violation.

On the other hand, this Court has not stayed discovery against Morningside, and Morningside has made a timely request for summary judgment on this claim.

The Supreme Court has held that a municipality is an individual for the purposes of Section 1983 in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  In *Monell*, however, the Court emphasized that:

> a municipality cannot be held liable *solely* because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.
>
> . . .

> [T]herefore, . . . a local government may not be sued under § 1983 for
> an injury inflicted solely by its employees or agents.  Instead, it is
> when execution of a government's policy or custom, whether made
> by its lawmakers or by those whose edicts or acts may fairly be said
> to represent official policy, inflicts the injury that the government as
> an entity is responsible under § 1983.

*Id.* at 691, 694 (emphasis in original). Because this Court may not impose vicarious liability under

Section 1983, Plaintiffs not only must prove the existence of a constitutional violation by a person

acting under the color of law, but also must show that Brickell inflicted the injury acting pursuant

to a  Morningside policy or custom.  *See  Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)

(*Monell* violation occurs only when the county "causes a deprivation through an official policy or

custom.").

In response to Morningside's Motion for Summary Judgment, Plaintiffs have failed to offer

any evidence that Morningside had a policy or custom in place that led to the deprivation alleged.

Therefore, this Court will grant summary judgment in favor of  Morningside on the *Monell* claims.

II.    **Plaintiffs' State Law Claims**

1.    Claims under the Maryland State Constitution

In addition to claims under the Fourth Amendment, Plaintiffs also allege violations of

Articles 24 and 26 of the Maryland Declaration of Rights.  The Maryland Court of Appeals has held

that the analysis of these sections of the Maryland Declaration of Human Rights is the same as that

under the United States Constitution. *Williams v. Prince George's County*, 685 A.2d 884, 895 (Md.

1996).  Stated differently, Articles 24 and 26 of the Maryland Constitution are in *pari materia* with

the Fourteenth and Fourth Amendments of the federal constitution, respectively. *Id.*; *accord Okwa

v. Harper*, 757 A.2d 118, 140-41 (Md. 2000).

In the preceding sections of this Opinion, the Court has held that a material issue of fact

exists as to whether the officers violated the Decedent's Fourth Amendment rights. Because excessive force claims are properly analyzed under the Fourth Amendment, however, this Court will grant summary judgment insofar as Plaintiffs seek redress for a violation of Article 24, the provision analogous to the Fourteenth Amendment Due Process Clause. *See also* Section I.1.A n.5, *supra*. Therefore, the Court will deny summary judgment on the state law constitutional claim under Article 26, but will grant summary judgment on Plaintiffs' Article 24 claim.

2.      Local Government Tort Claims Act

Counts 7 and 15 of Plaintiffs' Fourth Amended Complaint are presented as claims for "Vicarious Liability" under the Local Government Tort Claims Act. As Defendants have noted, the Local Government Tort Claims Act does not create independent cause of action. Plaintiffs have conceded that they "do not contend that the Local Government Torts Claims Act provides a separate cause of action against Defendants." In light of this admission, this Court will grant summary judgment on these two counts.

3.      Gross Negligence, Battery and Intentional Infliction of Emotional Distress

Finally, Defendants Weaver, McDonald and Levin contend that they are entitled to summary judgment on all of Plaintiffs' tort law claims for negligence, gross negligence, battery and intentional infliction of emotional distress. These Defendants claim that "there is no evidence that these three individuals did anything to the [D]ecedent other than the specific actions that they admitted to in attempting to gain control and place this person under arrest." Again, the officers ask this Court to assume the role of fact-finder and reconcile their version of the events of April 26, 1999 with that of Plaintiffs' witnesses. Again, this Court notes that the record shows that there is a genuine question of fact whether the officers used additional force after the Decedent was under

arrest and in arm and leg restraints.  Because there is conflicting testimony regarding the police officers' use of force that night, this Court will deny summary judgment on these counts.

## CONCLUSION

Therefore, for the aforementioned reasons, this Court will DENY *in part* and GRANT *in part* PGCM's Motion for Summary Judgment and Morningside's Motion for Summary Judgment.  This Court will deny Morningside and Brickell's Motion for Summary Judgment on Counts 3 and 11, but will grant summary judgment on the remaining counts.  With respect to PGCM's Motion for Summary Judgment, the Court will deny summary judgment on Counts 1, 2, 3, 6, 10, 11, 14, 17, 18, and 19.  Summary judgment is granted in favor of the PGCM Defendants on all other counts.  An Order consistent with this Opinion will follow.

Date:  <u>June 15, 2006</u>                    <u>                /s/                </u>
                                                        Alexander Williams, Jr.
                                                        United States District Court